**IN THE UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF OHIO EASTERN DIVISION**

| | |
|---|---|
| ROBERT BLEDSOE,<br><br>Plaintiff,<br><br>vs.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>Defendant. | CASE NO. 4:25-CV-02343-SL<br><br>JUDGE SARA LIOI<br><br>MAGISTRATE JUDGE DARRELL A. CLAY<br><br>**REPORT AND RECOMMENDATION** |

## INTRODUCTION

Plaintiff Robert Bledsoe challenges the Commissioner of Social Security's decision denying supplemental security income (SSI). (ECF #1). The District Court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter was referred to me under Local Civil Rule 72.2 to prepare a Report and Recommendation. (Non-document entry of Oct. 30, 2025). For the reasons below, I recommend the District Court **AFFIRM** the Commissioner's decision.

## PROCEDURAL BACKGROUND

On November 15, 2021, Mr. Bledsoe applied for SSI, alleging disability began on his date of birth in 1985 due to post-traumatic stress disorder (PTSD), anxiety, depression, and attention deficit hyperactivity disorder (ADHD). (Tr. 67). After his claim was denied initially and on reconsideration, Mr. Bledsoe requested a hearing before an administrative law judge. (Tr. 84, 94, 118). On August 10, 2023, Mr. Bledsoe (represented by counsel) and a vocational expert testified before the ALJ. (Tr. 34-65). On October 6, 2023, the ALJ determined Mr. Bledsoe was not disabled. (Tr. 17-26). On December 22, 2023, the Appeals Council denied Mr. Bledsoe's request

for review of the decision, making the hearing decision the final decision of the Commissioner. (Tr. 1-3; *see also* 20 C.F.R. § 416.981). Following appeal of that decision, Mr. Bledsoe and the Commissioner stipulated to remand the matter to the Commissioner for further consideration of his claim. (Tr. 1104).

On remand, the ALJ held hearings on January 14 and June 17, 2025, during which Mr. Bledsoe and a medical expert testified, and a vocational expert (VE) testified at the second hearing. (Tr. 1007-78). On July 11, 2025, the ALJ determined Mr. Bledsoe was not disabled, making the hearing decision the final decision of the Commissioner. (Tr. 982-98; *see also* 20 C.F.R. § 416.1484(d)). Mr. Bledsoe timely filed this action. (ECF #1).

## Factual Background

### I. Personal and Vocational Evidence

Mr. Bledsoe was 36 years old on the application date and 40 years old at the last hearing. (*See* Tr. 67). He quit school in sixth grade and obtained his GED in 2009. (Tr. 1544). Mr. Bledsoe previously worked in "various factory jobs" and, most recently, as a power tool technician. (Tr. 1012, 1434).

### II. Relevant Medical Evidence[1]

Mr. Bledsoe describes a long history of mental health issues stemming from childhood abuse and trauma. (*See, e.g.*, Tr. 429, 486). By his report, he also has a lengthy criminal history dating back to childhood and used crack cocaine for approximately 10 to 15 years. (Tr. 486, 540). Discussed more fully below, the medical records show Mr. Bledsoe reported persistent and

[1] Although Mr. Bledsoe has physical impairments, he challenges the ALJ's evaluation of the state agency reviewing consultants' medical opinions concerning his mental health impairments. (ECF #8 at PageID 1775). Accordingly, I limit my discussion to those conditions.

uncontrolled paranoid thoughts (usually concerning admittedly unwarranted suspicions about his girlfriend's fidelity) and his providers consistently noted findings of obsessions, ruminations, persecutory delusions, and preoccupations. Though he is aware these thoughts are irrational, he still reacts as if they are true. He also regularly reported using marijuana for its calming effect. Complicating his treatment, Mr. Bledsoe usually did not take his medications as prescribed.

In the months leading up to November 2021 (the month Mr. Bledsoe filed his application for benefits) and through the relevant period (November 2021 to May 2025), Mr. Bledsoe received regular medication management and counseling at Signature Health, primarily through telehealth services. During a mental health assessment in February 2021, Mr. Bledsoe described himself as antisocial and reported high anxiety, stress, depression, paranoia, and past trauma. (Tr. 487, 490). He endorsed using marijuana all day and reported it helps his anxiety. (Tr. 486). Mr. Bledsoe was easily distracted and difficult to redirect throughout the assessment. (Tr. 487).

At a psychiatric assessment in March 2021, Mr. Bledsoe described symptoms of depression (rumination, isolation, sleep problems), PTSD (avoidance, hypervigilance, fear, horror, anger, guilt, shame), impulsivity, and paranoia. (Tr. 499). On mental status examination, Mr. Bledsoe demonstrated a fluctuating mood with full affect, sustained attention and concentration, linear thought process, and good memory. (Tr. 497). He endorsed paranoia as a "major contributor to his lifestyle" and said it "interferes with his relationships on all levels." (Tr. 499). Specifically, he noted trust issues and paranoid thoughts that his girlfriend is cheating on or manipulating him. (*Id.*). The provider assessed paranoia, PTSD, and impulsivity and prescribed Abilify. (Tr. 500). Mr. Bledsoe never started Abilify. (Tr. 565).

In November 2021, Mr. Bledsoe met with psychiatrist Carol Chan, M.D., and reported symptoms of anxiety, depression, and paranoia. (Tr. 563). He characterized his paranoia as "not trusting anyone." (*Id.*). He described constantly feeling like others are plotting or scheming against him and endorsed low moods with episodes of high anxiety that can last for hours or days at a time. (Tr. 565). He admitted overanalyzing his relationship with his girlfriend and checking around the house and backyard for signs that his girlfriend snuck out of the house. (Tr. 563). Mr. Bledsoe reported he is aware that some of his thought patterns, especially those about his girlfriend, are irrational but he still feels hurt and upset. (*Id.*). He explained he cannot work because he is constantly worrying about his girlfriend and other people's intentions. (Tr. 564). In the past, he has acted on his irrational thoughts, leaving work to check up on his girlfriend. (*Id.*). On examination, Mr. Bledsoe was anxious and distressed with a constricted affect, but he demonstrated fair concentration and attention, and his thoughts were linear, logical, and organized. (Tr. 567). Dr. Chan diagnosed PTSD and ADHD and prescribed Lexapro and Vistaril. (Tr. 568). A week later, Mr. Bledsoe reported that Lexapro helped calm him and reduced his racing thoughts but made him feel hazy and nauseous. (Tr. 555). He had not started taking Vistaril. (*Id.*). Dr. Chan instructed Mr. Bledsoe to take Lexapro at night and start Vistaril. (Tr. 557).

In December 2021, Mr. Bledsoe reported feeling "really tired" after taking Lexapro at night and he had not started Vistaril. (Tr. 544). He described feeling calmer, with less irritability and anger, but still had vivid internal thoughts and remained hypervigilant. (*Id.*, *see also* Tr. 546). Dr. Chan noted that Mr. Bledsoe sounded anxious, but he showed a linear and logical thought process

and fair attention and concentration. (Tr. 545). Dr. Chan stopped Lexapro due to "intolerable sedation effect" and prescribed venlafaxine. (Tr. 546).

Mr. Bledsoe sought primary care treatment in June 2022. (Tr. 613). In addition to some physical issues, Mr. Bledsoe described "very bad" sleep, paranoia, trust issues with his girlfriend and his neighbor, and restlessness. (Tr. 614). His physician restarted Lexapro and Abilify for mood stabilization and paranoia. (Tr. 613). Mr. Bledsoe took the medication for five days but stopped due to chest pain. (Tr. 633). In August, Mr. Bledsoe reported feeling better about his girlfriend after she took a lie detector test. (Tr. 651). His negative thoughts persisted but the test results made it easier to convince himself that his thoughts were not true. (*Id.*).

By September 2022, Mr. Bledsoe had been without medication for nine months. (Tr. 644). To Dr. Chan, he reported increased anxiety and depression and widely variable levels of energy, concentration, and focus, and described his typical paranoid thoughts. (*Id.*). The mental status examination was unremarkable except for his anxious, constricted, and depressed affect. (Tr. 642). Dr. Chan prescribed Remeron. (Tr. 644).

Mr. Bledsoe followed up with Dr. Chan on November 1, 2022 and reported stopping Remeron because he felt cranky and sedated in the morning. (Tr. 630). Dr. Chan's progress note suggests Mr. Bledsoe tried Remeron for one night only. (*Id.*) ("Therapy note 10/31/22 indicated [patient] had not tried his medications yet"). Mr. Bledsoe also endorsed anxiety, irritation, intermittent depression, and fair concentration depending on the activity. (*Id.*). Dr. Chan prescribed Trintellix. (Tr. 634).

Mr. Bledsoe started Trintellix in early December and reported some reduced anxiety and irritability. (Tr. 737). Later that month he endorsed improvement with medication: his typical

thoughts persisted but he was learning to react better to conflict. (Tr. 736). Despite improvement, Mr. Bledsoe stopped taking Trintellix in December 2022 or January 2023 due to side effects. (Tr. 734-35).

In February 2023, Mr. Bledsoe reported overthinking his girlfriend's actions, racing thoughts, anger issues, anxiety, and varying levels of concentration and focus, "about the same as before he was on meds." (Tr. 731). Dr. Chan noted he was anxious but alert and with unremarkable thought content and process. (Tr. 727). She prescribed Seroquel for sleep, PTSD, and anxiety. (Tr. 730).

Upon conviction for domestic violence, Mr. Bledsoe was in prison between May 2023 to July 2023, during which he declined to restart his mental health medications. (Tr. 967, 971).

Mr. Bledsoe returned to Dr. Chan's office in July and reported anxiety and his typical paranoid thoughts. (Tr. 1406). He was still using marijuana because it reduced his racing thoughts and admitted difficulty with adherence to antidepressants because they take longer to have noticeable effect, and cause oversedation. (*Id.*). Dr. Chan did not prescribe any medication then or in August because the combination of marijuana and gabapentin (prescribed for a physical condition) reportedly helped reduce Mr. Bledsoe's anxiety. (Tr. 1410).

In November 2023, Mr. Bledsoe reported some paranoia, anxiety, and depression, and described his motivation and focus as "so-so." (Tr. 1372). He explained marijuana helps him feel calmer when he is acutely under its influence but the effects are short-lived. (*Id.*). Mr. Bledsoe declined other medications. (Tr. 1378).

Thereafter, counseling notes reveal persistent paranoid thoughts about his girlfriend and document both improvements and setbacks in his ability to implement coping skills to manage

those thoughts. (*See, e.g.*, Tr. 1351, 1344-45, 1347-48, 1353, 1356, 1363). But by July 2024, Mr. Bledsoe had deteriorated and reported increased paranoid thoughts. (Tr. 1596-97, 1602-03, 1609). His counselor documented anxious and fearful behavior; sad, nervous, anxious, and scared mood; soft and pressured speech; and ruminations and fearful thoughts about his extreme distrust and increased suspicion of his girlfriend, an upcoming court date, and the possibility of losing his family. (*Id.*).

In the beginning of August, Mr. Bledsoe was arrested and charged with domestic violence. (*See* Tr. 1433). He was released from custody on August 5th and, during a counseling session the next day, expressed suicidal and homicidal ideation, without plan or intent, believing that his girlfriend was cheating on him with one of the neighbors. (*Id.*). On August 7, he went to the Windsor-Laurelwood Center for Behavioral Medicine for racing thoughts, difficulty sleeping, hopelessness, and worsening paranoia that interfered with his concentration. (*Id.*). He was anxious and distracted, could not respond to some open-ended questions or recall his recent or remote treatment history, and had limited insight. (Tr. 1434-35). The provider noted vague paranoia, negative thought content, and Mr. Bledsoe's report that he sometimes "feels like he can predict the future." (Tr. 1434). The provider assessed him with major depressive disorder with psychotic features, PTSD, and ADHD, and could not rule out bipolar disorder. (Tr. 1435). Mr. Bledsoe was admitted for treatment and prescribed Remeron for anxiety, depression, and sleep. (*Id.*). During his stay, Remeron and Risperdal helped reduce his paranoia, agitation, and anxiety, and improved his sleep. (Tr. 1430). He was discharged on August 23 and released to a residential treatment facility. (Tr. 1430, 1543).

During a medication management appointment in September 2024, Mr. Bledsoe reported some improvement with Risperdal but he stopped taking Remeron due to sedation. (Tr. 1543). The physician assistant noted an anxious mood, obsessions, a circumstantial thought process, and persecutory delusions. (Tr. 1552). At Mr. Bledsoe's next appointment, the provider documented similar findings and noted he was "distractible." (Tr. 1539). Mr. Bledsoe was prescribed Vyvanse for ADHD. (Tr. 1541).

By October, Mr. Bledsoe was noticeably more attentive during his appointment, although he was anxious, made poor eye contact, and his ruminations on paranoid thoughts persisted. (Tr. 1516, 1524). He reported getting along with others at the treatment center, using cannabis again, and reconciling with his girlfriend. (Tr. 1515-16). The provider continued his prescriptions for Risperdal and Vyvanse. (Tr. 1526). Mr. Bledsoe was discharged from the treatment center on October 24. (*See* Tr. 1725).

By the time Mr. Bledsoe sought further treatment on December 19, 2024, he had been without medication for two weeks and reported sadness, anxiety, hypervigilance, restlessness, intrusive thoughts accompanied by vivid visualizations, irritability, and sleep disturbance. (Tr. 1725-26). The nurse practitioner confirmed Mr. Bledsoe continued to use medical marijuana daily and, on examination, documented depressive cognitions, obsessions, and ruminations, and noted Mr. Bledsoe was restless and distracted at times, but his thought process was goal-directed, linear, coherent, and logical. (Tr. 1727, 1729-30). He was prescribed fluoxetine for PTSD, depression, and anxiety; Vyvanse for ADHD; and prazosin for sleep and anxiety. (Tr. 1734).

Due to shortages and other issues at the pharmacy, Mr. Bledsoe only received prazosin. (Tr. 1701). During his next medication management appointment in January 2025, the provider

noted Mr. Bledsoe was "less talkative/engaged," "more disengaged/distracted," and "more withdrawn, restless, and irritable." (Tr. 1706). The provider directed Mr. Bledsoe to restart fluoxetine and Vyvanse when available, increase prazosin, and restart Risperdal as needed "to rapidly manage severe [symptoms] until his next visit." (Tr. 1711).

Mr. Bledsoe restarted his medications in February and reported feeling better. (Tr. 1679). He ran out of his medications again at the end of March and reported increased anxiety, paranoid thoughts, sleep disturbances, and anger. (Tr. 1674, 1677). His counselor simultaneously documented anxious and fearful behavior, rapid speech, nervousness, and ruminations. (Tr. 1675).

During his medication management appointment in April, Mr. Bledsoe reported he was not taking his medications as prescribed because he was concerned about side effects. (Tr. 1660). The provider stopped Risperdal and prescribed Abilify. (*Id.*).

## III. Relevant Opinion Evidence[2]

On initial review, state agency psychological consultant Paul Tangeman, Ph.D., considered Mr. Bledsoe's alleged impairments, symptoms, reported activities of daily living, and medical records in January 2022. (Tr. 76-77, 82). Dr. Tangeman opined Mr. Bledsoe is mildly limited in understanding, remembering, or applying information and moderately limited in interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. (Tr. 78). In the area of understanding, remembering, and applying information, he found Mr. Bledsoe can comprehend and remember simple and occasionally complex tasks. (Tr. 81). In the area of concentration, persistence, and pace, he opined Mr. Bledsoe can understand, remember, and

[2] A medical expert provided his opinion and supporting explanation at the administrative hearing. His testimony is summarized in Section IV.

perform simple and moderately complex tasks but when symptoms increase he "will occasionally need flexibility in work schedule, taking breaks, and pacing." (*Id.*). In the area of interacting with others, he determined Mr. Bledsoe may be overly sensitive towards constructive criticism and should be limited to brief and superficial interactions with co-workers and supervisors due to depressive symptoms. (*Id.*). In the area of adapting and managing himself, he can adapt to a "fairly predictable work environment" in a setting where major changes are explained beforehand. (Tr. 81-82). On reconsideration, state agency psychological consultant Irma Johnston, Psy.D., considered Dr. Tangeman's findings and updated evidence and determined Dr. Tangeman's "initial decision is supported." (Tr. 92).

**IV. Relevant Function Report and Testimonial Evidence**

In October 2022, Mr. Bledsoe's girlfriend completed the SSA's Adult Function Report describing how his conditions affect his ability to function. (Tr. 220-27). She explained Mr. Bledsoe begins his day by reviewing his cameras and checking the doors and windows. (Tr. 221). He does chores, plays video games, and plays with and cares for the dog until his stepchildren and girlfriend come home, has dinner, and watches television. (*Id.*). He helps care for the children when needed. (*Id.*). Mr. Bledsoe has no problems attending to his personal hygiene but needs reminders to take his medicine. (Tr. 221-22). He can do household chores and yard work but needs help or encouragement from his girlfriend and does not do them as often as needed; whether he does those tasks depends on his mood. (Tr. 222). He can shop in stores and order by mail as needed. (Tr. 223). He enjoys playing video games, fixing things, and model cars, but whether he can do them depends on his mood. (Tr. 224). He has anxiety about "going out," so he needs to have someone close by to ease his tension and he avoids places that make him

uncomfortable. (*Id.*). Being anxious affects his mood and how well he gets along with those around him; when anxious, he is "not nice." (*Id.*). Mr. Bledsoe can pay attention, finish what he starts, and follow instructions if he is not triggered to that highly anxious state. (Tr. 225). When his anxieties overcome him, he does not focus on anything other than what is worrying him at that moment, affecting his memory, concentration, and abilities to complete tasks, following instructions, and get along with others. (*Id.*). Mr. Bledsoe has been fired after "g[etting] into it a couple times" with his boss. (*Id.*). He does not handle stress or change in routine well because he gets overwhelmed by negative thoughts. (Tr. 226). Mr. Bledsoe fears his girlfriend is cheating on him, so he has cameras set up, stays up all night, and checks all the doors and windows and soon as he awakens. (*Id.*). His thoughts cause mood swings throughout the day. (*Id.*).

The ALJ held two hearings before issuing the decision. At the first hearing, Mr. Bledsoe testified about his past work as a power tool technician in 2021 where he disassembled and cleaned tool parts. (Tr. 1012). He worked 30 to 40 hours a week for about three months but stopped because he could not stay focused on the work. (Tr. 1013). He was constantly asking to leave work early or take the day off. (*Id.*).

Mr. Bledsoe also testified about how his conditions affect his ability to function. He has mood swings from "out of the blue" and lashes out at others when he is angry or irritable and, consequently, he has gotten into "a couple confrontations" at the workplace. (Tr. 1014). He has anxiety attacks once or twice a week that begin with uncontrolled thoughts. (*See* Tr. 1015) ("I just start having thoughts and my mind wanders and chases on whatever thought process is at that moment"). He latches onto paranoid thoughts, causing him to question everybody and becoming very irritated for hours and sometimes days at a time. (*Id.*). These symptoms persist despite taking

medications to address his mental health impairments. (Tr. 1016). Mr. Bledsoe testified he sometimes had problems getting some of his prescribed medications in the past, so he did not always take them as directed. (Tr. 1019).

When he is around other people, his mind starts to race with negative thoughts, usually that they are "out to get [him] or screw [him] over or something." (Tr. 1017). He described hypervigilance in his relationship, setting up cameras in his house, checking for footprints outside when it snows, making his girlfriend take lie detector tests, and playing out scenarios and worries in his head until he verbally and physically attacks her, leading to his arrest. (Tr. 1017). They usually do not go to family gatherings for that reason. (Tr. 1020) ("I'll start thinking that people are sneaking around or—through the bathroom or this or that"; "I'll tell my [girlfriend] don't leave my sight"). He relies on his girlfriend to reassure him that she is not cheating or "going out on" him, nobody is coming over while he is sleeping, and that he is loved and cared for between 50 to 100 times a day. (Tr. 1016, 1019).

Mr. Bledsoe cannot work a full-time schedule because from the moment he is at work, his mind begins to race with negative thoughts, and he wants to be on his phone to check the house cameras. (Tr. 1023). For example, if he goes next door for ten minutes to speak with the neighbor, he checks the house cameras from his phone three or four times to see if his girlfriend is sneaking around. (*Id.*). When she comes back from solo trips to the grocery store, Mr. Bledsoe repetitively "question[s] her up and down" about if she talked to anyone else while she was gone. (Tr. 1023-24). His behavior "causes a lot of irritation and problems in our relationship." (Tr. 1024).

Mr. Bledsoe leaves the home "maybe three times a week." (Tr. 1022). At his girlfriend's insistence, Mr. Bledsoe goes grocery shopping "here and there," but he usually makes an excuse to

stay home. (*Id.*). He attends most medical appointments by video. (*Id.*). Mr. Bledsoe also struggles with memory, paying attention, and concentrating on things. (Tr. 1016). He cannot sit still or focus when his mind is racing; he must pace back and forth. (Tr. 1018). His girlfriend tries to get him to sit down to watch a movie or eat dinner but usually he does not sit still; he "go[es] back and forth between the house and the outside to smoke a cigarette." (Tr. 1021). Mr. Bledsoe's girlfriend recently gave birth to their child. (Tr. 1020). He does not help much to care for the baby because he gets agitated and cannot stay focused all the time. (*Id.*). His teenage stepdaughter enrolled in homeschooling to be home to help with the baby. (*Id.*).

When questioned about marijuana use, Mr. Bledsoe confirmed he uses medical marijuana "here and there" and that it helps his symptoms. (Tr. 1022-23). He reported that the doctor told him excessive use could worsen his anxiety and advised moderation. (Tr. 1027).

Medical expert Dr. David Peterson then testified about Mr. Bledsoe's mental impairments. He determined Mr. Bledsoe's impairments are potentially severe but emphasized that his marijuana use will "have an impact on attention, concentration, and cognitive functioning," and the severity of his symptoms appears linked to his compliance with medication. (Tr. 1031-32). He opined Mr. Bledsoe has a mild-to-moderate limitation in "understanding, remembering, and applying information," moderate-to-marked limitation in "interacting with others," moderate limitation in "concentration, persistence, and maintaining pace," and moderate-to-marked limitation in adapting and managing himself. (Tr. 1033-34). Clarifying the marked limitations, Dr. Peterson emphasized that Mr. Bledsoe was more functionally impaired when he was not taking his medications as prescribed and using marijuana. (*Id.*). In contrast, he is moderately limited when he takes his medications as prescribed and abstains from marijuana use. (Tr. 1034-35). Absent those

factors, Dr. Peterson opined Mr. Bledsoe can complete simple, repetitive tasks, should not have contact with the public, should be in positions that "focus[ ] on working with things as opposed to people," cannot perform tandem or group-work, and should avoid fast-paced or piece-rated work. (Tr. 1035-36). According to Dr. Peterson, marijuana use also increases or maybe even causes paranoia. (Tr. 1036-37). Consequently, he disagreed with Ms. Fisher's assessment and concluded Mr. Bledsoe is no more than moderately limited in the areas of mental functioning, "based on the totality of the record with compliance and abstinence." (Tr. 1037). The ALJ scheduled a second hearing for Dr. Peterson to testify after he considered additional medical records. (Tr. 1038).

At the second hearing, Mr. Bledsoe confirmed he still has paranoid thoughts, mood swings, and issues with attention and concentration. (Tr. 1045-46). He described pacing his house all day while his girlfriend is at work, needing constant reassurance from his girlfriend about their relationship, and getting agitated, anxious and panicky when his child cries too much. (Tr. 1050). When his girlfriend works, they keep their phones on and connected through a voice call with his phone on mute so he can listen to her throughout the day because it eases his mind. (Tr. 1055-56). She checks the line and speaks with him when she takes a break. (Tr. 1055).

Mr. Bledsoe reiterated that he prefers marijuana over prescription medications because it calms him down and explained that he gets very agitated when he does not use it for a few days. (Tr. 1057). His prescription medications help with some of his symptoms but do not take away the racing thoughts. (Tr. 1054). The racing thoughts draw his full attention and prevent him from concentrating on anything else. (Tr. 1054-55). He can concentrate on other things, like video games, in limited circumstances, like when he knows his girlfriend is sleeping. (Tr. 1056).

Dr. Peterson then testified. Consistent with his prior testimony, Dr. Peterson re-emphasized that Mr. Bledsoe's daily marijuana use impairs attention, concentration, and memory, and his symptoms improve when he follows prescribed care. (Tr. 1064). He concluded Mr. Bledsoe is not limited in "understanding, remembering, and applying information," but moderately limited in the other three areas of mental functioning (Tr. 1064-65) and opined he is restricted to simple, repetitive, detailed, and complex tasks; no contact with the public; occasional contact with co-workers and supervisors; positions that focus on working with things and not people; no tandem or team work, no fast-paced or piece-rated work; and occasional changes in job requirements (Tr. 1066). Dr. Peterson could not say with certainty how much Mr. Bledsoe's marijuana use contributes to his limitations because his use has been ongoing but expected improvement with abstinence. (Tr. 1066-67). Mr. Bledsoe's counsel then asked Dr. Peterson if it was reasonable to assume the impairments would cause an individual to be off task, arrive late, leave early, or miss work altogether. (Tr. 1068). Dr. Peterson recalled Mr. Bledsoe last worked repairing power tools but did not have attendance records that could support that prediction. (*Id.*).

The VE then testified an individual limited to medium-exertion work and subject to the restrictions listed in the ALJ's decision (*see* Tr. 988-89) can work as a bus and semi-truck cleaner, store laborer, and industrial cleaner. (Tr. 1073-74). She also testified employers generally tolerate an employee being off task for no more than 10% and absent no more than six days a year. (Tr. 1074). So, an individual that needs an extra 15-minute break each day in addition to normal breaks cannot maintain employment. (*Id.*). And, because there is not a lot of flexibility in the typical work schedule, the need for "occasional flexibility with their work schedule or pace" would become an accommodation, thus eliminating the competitive work environment. (*Id.*). In response

to questions from Mr. Bledsoe's counsel, the VE confirmed an individual cannot work if the person cannot handle "more than shallow or cursory types of interactions with their supervisors" during the training or probationary period, or if the person needs frequent redirection or repetition to complete tasks. (Tr. 1075).

## STANDARD FOR DISABILITY

Eligibility for benefits turns on the existence of a disability. 42 U.S.C. § 423(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Id.* § 1382c(a)(3)(A); *see also* 20 C.F.R. § 416.905(a).

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine whether a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?
2. Did claimant have a medically determinable impairment, or a combination of impairments, which is "severe," defined as one which substantially limits an individual's ability to perform basic work activities?
3. Does the severe impairment meet one of the listed impairments?
4. What is claimant's residual functional capacity and can claimant perform past relevant work?
5. Can claimant do any other work considering his or her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to prove whether the claimant has the residual functional capacity (RFC) to perform available work in the national economy. *Id.* The ALJ considers the

claimant's RFC, age, education, and past work experience to determine whether the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is the claimant deemed disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## THE ALJ'S DECISION

At Step One, the ALJ determined Mr. Bledsoe had not worked since the date he filed his application. (Tr. 984). At Step Two, the ALJ identified PTSD, generalized anxiety disorder, bipolar disorder, mood disorder, ADHD, marijuana use disorder, major depressive disorder, delusion disorder, explosive personality disorder, and osteoarthritis of the lumbar spine and radiculopathy. (Tr. 985). At Step Three, the ALJ found Mr. Bledsoe's impairments did not meet or medically equal the requirements of a listed impairment. (*Id.*).

At Step Four, the ALJ determined Mr. Bledsoe's RFC as follows:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. 416.967(c) except frequently climb ladders, ropes, and scaffolds. The claimant has the ability to understand, remember, and carry out simple instructions. He can never interact with the public and can have occasional interaction with supervisors and coworkers. He can perform no tandem work. He can perform tasks that do not involve a specific production rate such as assembly line work or an hourly production quota. He can deal with occasional changes in a routine work setting.

(Tr. 988-89). The ALJ concluded Mr. Bledsoe did not have past relevant work. (Tr. 996). At Step Five, the ALJ determined Mr. Bledsoe could perform other work in the national economy, including as a cleaner, store laborer, and industrial cleaner. (Tr. 997). Thus, the ALJ concluded Mr. Bledsoe was not disabled. (Tr. 998).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters,* 127 F.3d at 528. The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). "Substantial evidence" is "more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Hum. Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). But "a substantiality of evidence evaluation does not permit a selective reading of the record. Substantiality of evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight." *Brooks v. Comm'r of Soc. Sec.*, 531 F.App'x 636, 641 (6th Cir. 2013) (cleaned up).

In determining whether substantial evidence supports the Commissioner's findings, the court does not review the evidence de novo, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Hum. Servs.*, 889 F.2d 679, 681 (6th Cir. 1989). Even if substantial evidence (or indeed a preponderance of the evidence) supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). This is because there is a "zone of choice" within which the Commissioner can act, without fear of court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Apart from considering whether substantial evidence supports the Commissioner's decision, the court must determine whether proper legal standards were applied. The failure to apply correct legal standards is grounds for reversal. *Walters,* 127 F.3d at 528. Even if substantial evidence supports the ALJ's decision, the court must overturn when an agency does not follow its own regulations and thereby prejudices or deprives the claimant of substantial rights. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004).

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (internal quotations omitted); *accord Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked.").

## Discussion

Mr. Bledsoe raises one issue for review: the ALJ's alleged failure to account for two of the limitations the state agency consultants found, namely that he needed "occasional flexibility in [the] work schedule, taking breaks, and pacing when symptoms increased" and he was limited to "brief and superficial interaction with coworkers and supervisors." (ECF #8 at PageID 1775-76). Citing Social Security Ruling (SSR) 96-8p, 1996 WL 374184 (July 2, 1976), Mr. Bledsoe contends the ALJ "failed to provide adequate explanation as to why either opinion should have been left out of the [RFC]" and thus "failed to create a logical bridge between the evidence and the ALJ's conclusions." (*Id.* at PageID 1776). He also argues the ALJ did not explain what evidence in the record was inconsistent with the consultants' opinions. (*Id.* at PageID 1778).

SSR 96-8p outlines the SSA's policies and policy interpretations guiding the RFC assessment. An RFC is "the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis." SSR 96-8p, 1996 WL 374184, at *2. The ALJ is solely responsible for assessing an individual's RFC and must base that assessment on all relevant evidence in the case record, including information about the individual's symptoms and any medical source statements from acceptable medical sources. *Id.*; *see also Coldiron v. Comm'r of Soc Sec.*, 391 F.App'x 435, 439 (6th Cir. 2010) ("The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC.").

As part of the RFC assessment, the ALJ must review all medical opinions and explain how persuasive she finds them. *See* 20 C.F.R. § 416.920c(b); *see also Reeves v. Comm'r of Soc. Sec.*, 618 F.App'x 267, 275 (6th Cir. 2015). The ALJ considers five factors to determine persuasiveness: (1) supportability; (2) consistency; (3) the source's relationship with the claimant, including length of treatment relationship, frequency of examinations, purpose of the treatment relationship, and examining relationship; (4) the source's specialization; and (5) any other factors that support or contradict a medical opinion. 20 C.F.R. § 416.920c(c)(1)-(5). The regulations require the ALJ to "explain how [the ALJ] considered the supportability and consistency factors for a medical source's medical opinions," those being the two principal factors. *See id.* § 416.920c(b)(2). Supportability is "the extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation," while consistency is "the extent to which the opinion is consistent with evidence from other medical sources and nonmedical sources in the claim." *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844-01, 5859, 2017 WL 168819 (Jan. 18, 2017). The ALJ's explanation should "generally include[ ] an

assessment of the supporting objective medical evidence and other medical evidence, and how consistent the medical opinion or prior administrative medical finding is with other evidence in the claim." *Id.* If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. SSR 96-8p, 1996 WL 374184, at *7. The reasons for the ALJ's conclusions must be stated in a manner permitting the reviewing court to "trace the path of the ALJ's reasoning" from evidence to conclusion. *Stacey v. Comm'r of Soc. Sec.*, 451 F.App'x 517, 519 (6th Cir. 2011). If the ALJ discusses both consistency and supportability and substantial evidence supports that discussion, the court may not disturb the ALJ's findings. *Paradinovich v. Comm'r of Soc. Sec.*, No. 1:20-cv-1888, 2021 WL 5994043, at *7 (N.D. Ohio Sept. 28, 2021), *report and recommendation adopted*, 2021 WL 5119354 (N.D. Ohio Nov. 4, 2021).

Here, the state agency consultants determined Mr. Bledsoe can (1) remember, comprehend, and perform simple and occasional complex tasks, (2) perform simple and moderately complex tasks but will occasionally need flexibility in his work schedule, taking breaks, and pacing when his symptoms increase, (3) have brief and superficial interactions with co-workers and supervisors due to his depressive symptoms, and (4) can adapt to a fairly predictable work environment. (Tr. 81-82, 91). The ALJ found the consultants' opinions partially persuasive because they are familiar with Social Security rules and regulations and they supported their opinions with explanations, but their opinions are "somewhat vocationally vague and not fully consistent with the medical evidence." (Tr. 994). The ALJ did not explain which of the opinions were vocationally vague or not fully consistent with the evidence, but the ALJ appears to have adopted the first and fourth limitations, so by process of elimination, the second and third limitations for "flexibility in

the work schedule" and "brief and superficial interactions" are the limitations the ALJ found vocationally vague and inconsistent with the evidence.

The ALJ did not identify specific evidence that contradicted the consultants' opinions but, in the same paragraph, the ALJ concluded "the record as a whole demonstrates the claimant was typically found to exhibit intact memory, and was found to exhibit rational, linear, coherent, and organized thought process." (*Id.*). Last, the ALJ also explained that the medical expert's suggested limitations are more defined and more consistent with the evidence as a whole. (*Id.*). Turning to the ALJ's evaluation of the medical expert's testimony, the ALJ stated as follows:

> Medical expert, David B. Peterson, Ph.D., testified at an initial hearing and a supplemental hearing. Because Dr. Peterson had not had the opportunity to review all of the medical records at the initial hearing, his opinion at that time was found to be unpersuasive. At the supplemental hearing, Dr. Peterson testified that after reviewing the medical records, he found diagnoses of unspecified mood disorder, PTSD, generalized anxiety disorder, and attention deficit hyperactivity disorder. It was noted that when the claimant complies with his prescribed medications, the record demonstrates an improvement in symptoms, and he noted that any notes in the record regarding anxious mood or pressured speech could be attributable to the claimant's daily marijuana use. Dr. Peterson found that the claimant's mental impairments caused the following degree of limitation in the broad areas of functioning, set out in the mental disorders listings of 20 C.F.R., Part 404, Subpart P, Appendix 1: no limitations in understanding, remembering or applying information; moderate limitations in interacting with others; moderate limitations with concentration, persisting, or maintaining pace; and moderate limitations in adapting or managing oneself. He further opined that the claimant is limited to simple, repetitive, and at least occasional detailed and complex tasks. It was opined that the claimant can have no public contact at all and only occasional contact with coworkers and supervisors, but specifically in positions that focus on working with things and not people. There can be no tandem or teamwork required for the job, and no fast-paced or piece rated work required. Dr. Peterson further opined that the claimant can have only occasional changes to those job requirements. The undersigned finds Dr. Peterson's opinion from the supplemental hearing to be persuasive. At that time, Dr. Peterson had noted the opportunity to review all the medical records and hear all of the claimant's testimony. The undersigned finds this opinion to be persuasive, as it is supported by and generally consistent with the medical record in evidence, including findings of anxious, depressed, and/or fearful mood with some findings of constricted and/or distressed affect, with generally

> cooperative behavior and attitude, good eye contact, appropriate affect, and normal speech. Further, the undersigned finds persuasive Dr. Peterson's explanation that abnormal findings of anxiety and/or pressured speech may be attributable to the claimant's daily marijuana use.

(Tr. 990-91).

In terms of supportability, the ALJ concluded the first and fourth limitations were supported by the state agency consultants' explanations of the evidence, but the other limitations were somewhat vocationally vague. As this Court has previously determined, the occasional need for flexibility in the work schedule, taking breaks, and pacing when symptoms increase "certainly suggest some limitation," but "the ALJ's determination they were too vague to translate into work-related restrictions is appropriate." *Chiccola v. Comm'r of Soc. Sec.*, No. 1:18-cv-2940, 2020 WL 1031488, at *8 (N.D. Ohio Mar. 3, 2020). Moreover, the vagueness of an opinion is relevant to the supportability factor. *See Quisenberry v. Comm'r of Soc. Sec.*, 757 F.App'x 422, 434 (6th Cir. 2018) (holding an ALJ may properly discount an opinion that does not offer any specific functional limitations and expresses functional limitations in vague terms); *see also Maldonado v. Comm'r of Soc. Sec.*, No. 1:24-cv-415, 2025 WL 1104886, at *22 (N.D. Ohio Apr. 14, 2025) (a doctor's "vague" opinion goes to the supportability factor).

Moreover, I find no issue with the ALJ's alleged failure to explain why she did not adopt the consultant's limitation for brief and superficial interactions with coworkers and supervisors. Discussed above, if the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted. SSR 96-8p, 1996 WL 374184, at *7. In this case, the ALJ's RFC limits Mr. Bledsoe to occasional interaction with coworkers and supervisors and restricted him from performing tandem work with others. I find that these two limitations do not conflict with one another.

As Mr. Bledsoe correctly notes, some district courts have come to the opposite conclusion. These district courts "have adopted a fixed vocational definition of 'superficial interactions,' and 'presumed' that this definition is 'qualitatively inconsistent with occasional' interactions." *Stephen D. v. Comm'r of Soc. Sec.,* No. 1:21-cv-746, 2023 WL 4991918, at *6-8 (S.D. Ohio Aug. 4, 2023) (compiling cases), *report and recommendation adopted,* 734 F.Supp.3d 729 (S.D. Ohio May 16, 2024). These courts define "occasional" as limiting the quality of time spent interacting and "superficial" as limiting the quality of the interactions. *See, e.g., Hutton v. Comm'r of Soc. Sec.,* No. 2:20-cv-339, 2020 WL 3866855, at *4-5 (S.D. Ohio July 9, 2020), *report and recommendation adopted*, 2020 WL 4334920 (S.D. Ohio July 28, 2020); *Lindsey v. Comm'r of Soc. Sec.*, 2:18-cv-18, 2018 WL 6257432, at *4 (S.D. Ohio Nov. 30, 2018), *report and recommendation adopted,* 2019 WL 133177 (S.D. Ohio Jan 8, 2019). They reason that because the terms are defined differently, ALJs must sufficiently explain translating opined "superficial interaction" limitations into RFC limitations to occasional interaction. *See, e.g., Stephen D.*, 2023 WL 4991918, at *6-8 (compiling cases). According to these courts, because "'superficial interaction' is a well-recognized, work-related limitation," the ALJ's explanation that he declined to adopt such a limitation because "superficial" is vocationally vague or not a vocationally relevant term is insufficient. *Hutton*, 2020 WL 3866855, at *5; *see also Stephen D.*, 2023 WL 4991918, at *6-8 (compiling cases).

Nevertheless, I conclude that "occasionally" does not create a sufficient conflict with "superficially" that requires the ALJ to explain adopting a limitation to occasional interaction over a limitation to superficial interaction. "[T]ime-limited 'occasional' interactions in an unskilled work setting are reasonably understood to require only surface-level interactions." *Stephen D.,* 734 F.Supp.3d at 738; *see Metz v. Kijakazi*, No. 1:20-cv-2202, 2022 WL 4465699, at *9-10 (N.D. Ohio

Sept. 26, 2022). "[W]hen a person is limited to engaging in only short and infrequent interactions, that strongly correlates, as a practical matter, with interactions that are superficial, as well." *Stephen D.*, 734 F.Supp.3d at 738. In the absence of a conflict, the ALJ need not explain why she did not adopt the "superficial interaction" limitation. *See* SSR 96-8p, 1996 WL 374184, at *7.

In terms of consistency, the ALJ compared the opinions with the record, which showed Mr. Bledsoe's memory was typically "intact" and he exhibited rational, linear, and coherent thought process. This explanation alone is not sufficient to explain how this is inconsistent with the consultants' opinions, but the path of her reasoning can be traced in the ALJ's decision as a whole. In determining Mr. Bledsoe has a moderate limitation in concentrating, persisting, and maintaining pace, the ALJ noted that Mr. Bledsoe regularly reported experiencing racing thoughts, overthinking, and paranoia, and his providers sometimes noted he was ruminating on certain topics, but mental status examination findings regularly reflected he was alert, demonstrated unremarkable thought content, and exhibited a goal-directed and linear thought process. (Tr. 987). The ALJ also noted that during counseling sessions, Mr. Bledsoe often reported thinking that his girlfriend was cheating on him, but he was generally relaxed and engaged in the session. (Tr. 992, 993). In addition, the ALJ emphasized that Mr. Bledsoe was typically not compliant with medications even though he found them somewhat helpful. (Tr. 992). In finding Mr. Bledsoe has a moderate limitation in interacting with others, the ALJ emphasized that even when anxious or exhibiting a constricted or distressed affect, Mr. Bledsoe was routinely cooperative, and pleasant, made good eye contact, and spoke normally. (Tr. 987). These findings support the ALJ's decision not to adopt limitations for flexibility in the work schedule or brief, superficial interactions because even when Mr. Bledsoe does ruminate on his negative thoughts, the source of his anxiety,

those thoughts appear to have less functional effect on him than he describes, both in terms of maintaining concentration and pace and interacting with others. As such, I find substantial evidence backs the ALJ's supportability and consistency findings.

Because the ALJ properly evaluated the state agency consultants' opinions, I decline to recommend remand on this basis.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, I recommend the District Court **AFFIRM** the Commissioner's decision denying supplemental security income.

Dated: September 9, 2026

DARRELL A. CLAY
UNITED STATES MAGISTRATE JUDGE

## OBJECTIONS, REVIEW, AND APPEAL

**Within 14 days after being served with a copy of this Report and Recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the Magistrate Judge. *See* Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1); Local Civ. R. 72.3(b). Properly asserted objections shall be reviewed de novo by the assigned district judge.**

**Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal, either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the Report and Recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the Report and Recommendation; "a general objection has the same effect as would a failure to**

object." *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the Magistrate Judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-cv-186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*, 932 F.2d at 509). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).